Glad you're willing to come up here. Most people, we have to drag them up there. Good morning, Your Honors. May it please the court. I'm Oliver Coppell. I represent the claimants' appellants, a class of 470,000 consumers of credit counseling and credit repair assistance from respondents. And I'm joined here today by Joseph Tusa and Greg Duncan, who were very helpful in preparation and in the drafting of the brief. Why are we here? We won. The arbitrator ruled that CROA, the Credit Repair Organizations Act, had been violated. In fact, he even awarded punitive damages because he found that those violations were, in effect, intentional violations in violation of the statute. But even though we won and he awarded almost $2 million in punitive damages, the fact is that he awarded compensatory damages to the class in the face of awarding punitive damages and in face of his ruling that the Credit Repair Violations Act, in fact, violated. And the penalty provisions, which, of course, I'm going to talk about, require that all payments made by people who got the services of respondents had to be refunded. But that didn't happen. He also denied the reimbursement of costs. 1679 provides specifically that the prevailing party is entitled to costs and attorney's fees. We expended, in this portion of the arbitration, $338,000 in costs. He denied the reimbursement of any of those costs, saying that it was analogous to his denial of counsel fees, which we think completely different factors apply to costs and counsel fees. I'll get to that later, if I have time. He also denied any counsel fees, essentially holding not only that we overstated, we asked for too much, but also that because there had been prior settlements and he ruled in those prior settlements that the counsel fees we took in those settlements were reasonable, he offset. He first cut our counsel fee request by 2 thirds to 1 third and then said, well, I'm not even going to give you the 1 third because you were paid enough in the settlements. We again don't think that that is appropriate. Now, the question is, what is the role of this court? What is the role of this court? And we recognize that an arbitrator's decision is entitled to very strong deference. But that deference is not unlimited. The arbitrator's determination on damages, so widely and arbitrarily misread and distorted the clear and unambiguous damage provisions of Scrooge, that he essentially rewrote the statute. Now, I think we can- He didn't really rewrite it, though, did he? I think he did. What he did was he looked at the definition of a credit repair organization in interpreting the statute. And he said he looked at the language that it's the rendering of a service in return for the payment of money or other valuable consideration. Wasn't that how his analysis went? That's exactly correct, Your Honor. That's exactly correct. And that's why he ruled that respondents were CROWs, or credit repair organizations. Well, if they were CROWs because they received this money, and they received it for their services, money for services, therefore they're CROWs. But if it was money for services, you look then at the damage provision, 1679G, and 1679G says that any payments have to be refunded. It doesn't say whether those payments are voluntary. It doesn't say whether those payments were made and could then be waived. It says any payments. And these were payments, because if they weren't payments, he wouldn't have called them CROWs under 1679A3. Exactly what you said. That's why they're CROWs, because they got payments. Then he says they're not payments. Right, if the arbitrator made a mistake, or perhaps interpreted the law differently than you would, or perhaps I would, why is this a mistake so serious that we then invalidate the entire result? Well, as I was, well, I would like to reference the CompuCredit case. No, what you're saying is it's internally contradictory, because if it's a service in return for the payment of money to render you a CROW, it's necessarily a payment. That's exactly so, exactly so. Okay, but why is this, if we call it a misinterpretation, why is this misinterpretation, how does it fall under our case law that talks about the arbitrator can call things right or wrong, and we're not gonna do anything about it? Well, let me talk about the CompuCredit case. I know it's not from this court, but it's from the Supreme Court, and it deals with this very statute. And what Justice Scalia said is the statute says that a consumer has the right to sue, and what he says in the CompuCredit case is the right to sue includes, at least with respect to CROWA, the right to have a court review what the arbitrator did. This CompuCredit, talking about this statute, the statute says you have a right to sue, and therefore, Justice Scalia said that in order to mandate arbitration in terms of CROWA, because CROWA says you have a right to sue, in that case, the appellants, I guess, one of the parties in any event said, look, it says a right to sue, you can't send that to arbitration, it's gotta be in a court. He said, no, no, no, as long as a court ultimately has the decision, as long as the court ultimately has a review power, in addition, Your Honor, in your own line of cases, you recognize something that some circuits do and some circuits don't, and that is the manifest disregard standard. And I want to- I guess that's what I'm asking you. Yeah. How is this a manifest disregard? Well- I mean, it may be circular logic, as you're pointing out, but how is it manifest disregard? Well, let me quote from your case, so your decision in, your, this court's decision in Wachovia. Courts may vacate an arbitration award for manifest disregard of the law if, one, the applicable legal principle is clearly defined and not subject to reasonable debate, and two, the arbitrator refused to heed that legal principle. That's what we say here. That's the Wachovia case. Incidentally, the other side here, Mr. Greenwald, cites the Wachovia case with approval. The standard is, you cannot follow Justice Scalia's learning, if you will, and say that you don't have an obligation to see whether the statute was properly applied. It was not properly applied, clearly improperly applied. It's not a question of debate. It says- So you're saying it's a different standard of review then? How would you have us define that standard of review when a statute and a statutory right to sue is involved? We do think that there's a somewhat different standard of review when reviewing a statute, a decision with respect to the interpretation of a statute. If you were writing the opinion of the court then, what would you say that was? I would say that you have to apply the, when you interpret a statute, you have to properly apply what the Congress intended and what the Congress said in plain language. It's not only what they intended. You have to apply what is said in plain language in the mandate of the statute. That's your obligation as a court. And you cannot do what Judge Motz, with all due respect, he was very good to us in many lower court rulings. But in this case, he sort of abandoned his role. He said, I gave it a cursory review. It was many pages. I didn't say that. But he said, I gave it a cursory review and I think it therefore deserves deference. We can't do that. That's not what Justice Scalia said is the role of the court. That was not what Judge Motz should have done. Judge Motz should have looked and said, is it clear under the statute that payments have to be in fact reimbursed? And we think it is 100% clear under the statute. And that's why I started out saying that the arbitrator here rewrote the law. Because the law doesn't say whether they have to be voluntary or not. But in addition to that, as further indication of what should have been done here, we did have required payments. Even if you take the arbitrator's statement that it has to be a required payment. Because the payments though, they originally came from consumers. They were paid to the credit counseling agencies. And then the credit counseling agencies entered into a contract with the respondents for the provision of their support services. So it was a required payment under those service contracts. So even if you say that the arbitrator was right, it has to be required payments, we have required payments here. In addition, another factor that shows that we actually have required payments, the arbitrator himself said that the so-called fair share payments, I know we're getting into the woods here, but the fair share payments were payments from creditors to the respondents under contracts on behalf of the consumers, payments. The arbitrator said, well, I can't award those payments because if I did, it would defeat predominance. Well, that's not an appropriate, that's not true. The fact of the matter is that the amount of those payments was set forth in discovery and the individualized damage provision should not defeat predominance in the class action context. I think we have the Gunnels case that sets that forth. So we have required payments. First of all, I think that the payments of the so-called voluntary contributions were required payments. By the way, they were made by the consumers every month. They got a statement from the credit counseling agency and it said, you got to pay each month, you got to pay this amount and it includes a voluntary contribution of X amount per creditor. So $3, $4 per creditor. So your position is the arbitrator knew what he was doing was wrong, but just did it anyway. Yes, and why did he do that? Why would he do that? He's a very serious man. I think he's a very intelligent man. And why he did that was that he did not, he said himself in the opinion, he said, the result of holding them accro, a creditor review is harsh, but I am compelled to do that by the case law because it was the case law. There was some question as to whether they were in fact. He said it was harsh, but he said. Wait, wait, wait. I get to ask some questions. Sorry. He's saying it sounds like based on what you're telling me, he's saying the law is unclear. No, he said the law is harsh, but he has to interpret it. No, he said it's gonna be applied anyway. He has to apply it anyway. That's what he said. He said, the result of holding them accro is a harsh result, but I have to hold them accro. He wasn't talking there about the damage provision at all. When he got to decide damages after the whole thing was over, what he did when he did not wanna put them out of business, he admired Mr. Dansell. He said he was an extraordinary businessman. He said he was not an unscrupulous businessman. He started out to do good. He ended up- But he didn't rule against him, ultimately. He ruled against him, but only to a limited degree because he felt he had to rule against him, as I said. He said that the case law makes it clear that they are accro. It's also clear that they violated the Credit Repair Organizations Act. So he had to rule against them, but he didn't wanna put them out of business. And it was clear that if he had ordered the repayment of all the payments respondents got, hundreds of millions of dollars, couple hundred million dollars, they wouldn't be out of business. He didn't wanna do that. Well, unfortunately, the Congress, it's a strict liability statute. We were also involved as counsel in the Cambridge case. In the Cambridge case, the people who were held responsible were put out of business. As we understand it, they're out of business now. I guess it's unfortunate. I don't necessarily share, and the Congress didn't share the view of Mr. Dansell as not being unscrupulous. But whether he was unscrupulous or not, the Congress made it clear that you have to refund the money. The arbitrator didn't wanna do that because he said he wasn't unscrupulous, he was a good businessman, and he didn't wanna put them out of business. Otherwise, there's no explanation for what he did. It's clear, not only is it in violation of the statute on the voluntary payments, but as I indicated just now, and we indicated, there were required payments. There were required payments under the service agreements, and there were required payments under the fair share provision. So there were required payments. Also, what he did with respect to cost is totally inexplicable. Not only did he cut the costs by 2 3rds, saying he did it on the same basis as legal fees, but look, he cut the legal fees because he said our charges were too high on an hourly basis. He cut the legal fees because he said we did block billing. What does that have to do with costs? Nothing. Other factors it would have to do with costs. Nothing to do with that. He cut them by 1 3rd, and then he said he's gonna charge them against what we now found was an excessive counsel award from in the settlement cases, although he had found those awards to be fair and reasonable. And on legal fees themselves, he completely failed to apply the Johnson factors. It's clear from the McAfee case recently decided by your honors, and a whole series of other cases, there's at least a dozen cases that say in order to determine counsel fees, you have to go through Johnson. There are 12 factors, a whole bunch of different factors, the quality of counsel, the amount of time, the amount of the fee award. There's a whole series of 12 factors that have to be applied. And courts do apply them, and arbitrators do apply them. And when the court applies them, their decision is probably difficult to overturn, but he didn't apply them. He said, what he said is, he used a machete rather than a scalpel and concepts rather than calculations. You can't do that. That's beyond his powers, let alone in manifest disregard for the law. You just can't do that in determining counsel fees. So your honors, I think that this case cannot stand as the arbitrator decided it. It is beyond the power of the arbitrator to do what he did under the Federal Arbitration Act, and it's in manifest disregard for the law under the precedence of this court. So we ask your honors to reverse the confirmation of the arbitrator's award in the instances that we have placed in appeal, reminding that the remainder of the arbitrator's award was not appealed by the respondents, and we accept those rulings. Thank you. Thank you. Mr. Greenwald. Thank you. May it please the court, I'd like to start off by discussing the standard initially, then go into the question of attorney's fees and costs, which Mr. Copell has argued. And lastly, go into the question of voluntary contributions and enhanced damages under Crowe. The fundamental question in this appeal is whether the appellants have met what the Supreme Court and what this court have described as a heavy burden required to be met to vacate an arbitration. I suggest they have not met that burden, and there are two basic factors in this calculus. The first is, did the arbitrator exceed his powers under the Federal Arbitration Act? And the Supreme Court and this court basically have placed that inquiry  at the level of his contractually delegated authority. This is not the first time that this arbitration has been before the court. The court considered it about three, four years ago and came out with an unpublished per curiam decision in the Marist versus Jones at 457 Fed Appendix 287. And this court pointed out the narrow scope of review in these types of appeals, that judicial review of arbitration awards is among the narrowest known to the law, that the court is limited to determining whether the arbitrator did the job he was told to do. That is, whether he acted within the scope of his powers, not whether he did it well, correctly, or reasonably, simply whether he did it. The arbitration clause here is very clear in its scope and the court has published that arbitration clause in the earlier opinion that I referred to. And essentially, the arbitration clause says where there is a dispute between the parties, it shall go to arbitration and the arbitrator will resolve it. And that's what happened here. So there can be no viable claim that the arbitrator exceeded his powers. But the second prong of the calculus is manifest disregard. As we point out in our brief, the circuits are split in this. This circuit has held that manifest disregard of the law is a basis to overturn an arbitrator's decision. We respectfully take issue with that largely to preserve the point. There is a split in the circuits and it is our contention that in the face of the Supreme Court's decision in Hall Street versus Mattel, manifest disregard of the law, particularly as an independent ground for overturning an arbitral decision cannot stand. That is our position, but we understand this circuit has ruled otherwise. And so we'll take on the question of manifest disregard of the law. Here, I suggest that a friend, Mr. Coppell, is arguing no more than that the arbitrator error in some of his conclusions. That is not manifest disregard of the law. Manifest disregard means literally disregarding it, ignoring it. If you run through his decision throughout, he sure didn't disregard anything. He very carefully considered the issues in the case, including the specific issues raised by Mr. Coppell, and he came out differently than he came out. We think he came out correctly, but if he didn't, that's not the standard. Here, the record shows that the arbitrator analyzed the contentions, did what the parties engaged him to do, and that is not manifest disregard of the law. Now, with respect to fees and costs there. Are you finished on manifest disregard because it's a rather pointed point. The appellant's making as to the payments, characterizing payments in one way as to establishing a crook, and then as payments in another way. That's the, would you address that? They say it's manifestly disregard when it clearly is indisputable as to how you can come to a different conclusion. Would you address that, please? Yes, yes, I will, Your Honor. The specific provision dealing with damages is set forth in CROA in section 1679Ga2, and that provides that if liability is established, actual damages constitutes the greater of the amount of any actual damage sustained by the consumer. That's not an issue in this case. Or secondly, the amount paid by the person, being the consumer, to the credit repair organization. The critical words in that section, Your Honor, are the amount paid. What does the amount paid mean? The arbitrator took that on and went through a careful analysis of that, and he concluded that amount paid embraces a quid pro quo. That is, there has to be a transfer of funds. Where did that come from? Is that whole CLAW? No, sir, it comes from Black's Law Dictionary, and there are at least- Black's Dictionary, when you're looking at language that says amount paid, with all due respect to Black's Dictionary, it's amount paid. It means amounts you paid. I mean, I don't think it takes a rocket science to go to Black's for that. Your Honor, it's not only Black's Law Dictionary, which says specifically that the definition of paid means an exchange of money for something. I give you money, you give me services. That is an amount paid. That definition is supported by at least two decisions of courts of appeals. But didn't they get services? No, that's where, didn't they get services? Yes, but not in exchange for the voluntary contributions. And that's the point that Mr. Coppell overlooks. In this case, the only basis for his claim for damages were so-called voluntary contributions made by consumers. That was the only basis for damages at the trial level. The trial court, at some length, explained how the voluntary contributions worked and referred to evidence. There was substantial evidence on this point. And the point was that consumers were told, we encourage you to contribute something, but you don't have to. You will receive these services whether or not you contribute anything. And there was evidence in the case, Your Honor, there was an exhibit to which the arbitrator specifically referred, which showed something like 145,000 people in the class at one time or another did not make voluntary contributions, but still received the services under the DMP. So the quid pro quo with respect to voluntary contributions simply was not there. And that is the point. And the arbitrator went through this analysis and basically held that under his interpretation of the section, and I may have given you the wrong, section number, 1679 GA1B. That's a specific section. The arbitrator went through an analysis of that provision and simply held that under the law as he interpreted, under the meaning of amounts paid as he interpreted it, voluntary contributions did not fit. Now, let me address the question that Judge Keenan asked earlier and that my friend, Mr. Coppell, argued about. There was another section in CROA, and that's 1679 A3, which provides for a definition of CROA. And that says specifically that any person, and I'll skip some words, who performs any service in return for the payment of money is deemed to be a credit repair organization. That is a section which does not go to damages. It is the definition of a credit repair organization. And we were held to be a credit repair organization. And there was a basis in the record independently of these voluntary contributions to hold us a credit repair organization. We may disagree with what the arbitrator did, but that's what he did. And the other type of payment involved in this case is so-called fair share, which is a payment by a creditor to others. And basically the arbitrator held that we indirectly received fair share and that puts us within the definition of credit repair organization. That is different than whether voluntary contributions constitute an amount paid within the damages section. And that is the arbitrator's reasoning. It was an interpretive process, which the arbitrator undertook with some diligence. And he came out contrary to Mr. Cooper. Well, how would they be payments for services when there's no quid pro quo? You can't have it both ways. They didn't pay for services. They paid out of the goodness of their heart because they just wanted to give this company money because it's voluntary. And the way my clients were basically people who provided back office services, accounting services, computer services, to the people who actually contracted with the consumers. And the way we received our compensation was twofold. We received money from the credit repair organization, not directly from the consumers, by way of fair share and by way of voluntary contributions. You're saying that you, I'm sorry, I interrupted you. No, go ahead, Your Honor. No, no, go ahead. All right, well, and the point is that in order to recover damages, the burden was on them to show amounts paid. The question in the arbitrator's mind, and I submit accurately, was what do the words amounts paid mean? That's what he considered and analyzed. That's what he has authority for, the quid pro quo. And I understand Your Honor saying, well, you look at the word paid, if they paid something, what's all the fuss about? And the fuss, Your Honor, for purposes of interpreting the Credit Repair Organizations Act is that amounts paid does have a meaning, a significant meaning, and the term paid carries with it a quid pro quo and voluntary contributions do not carry with it a quid pro quo. That's how the arbitrator- So all you have to do to get around the congressional attendance is say, oh, no, they didn't pay anything, they volunteered to just give us this money. No matter how high profile this encouragement was, these people are already strapped financially in need of help. And then you say, well, you know, they volunteered, they didn't, so there's no quid pro quo and then there's no damages. Well, it's a little bit more than that. I think you need to look at the evidence and where the evidence is that the people who talk to consumers were instructed to tell the consumers, this is not mandatory, you don't have to do it. We appreciate you're doing it, but you don't have to. And where you have about 145,000 consumers who for one or more payments did not make any contribution, and some of them made no contribution whatsoever, that is evidence upon which I suggest to you it's fair for an arbitrator to review and reach a decision about. And I fully understand what your Honor is saying. And it could be that reasonable minds may differ on this and that your Honor taking this ob initio would reach a different conclusion, but the arbitrator was hired to do this. And that's what he did. His opinion on this is, and we've cited chapter and verse in our brief, is fairly detailed. And I think based on a definitional analysis, it's correct. Could someone else have come out differently? Perhaps, but it is not manifest disregard of the law to conclude that amounts paid within the meaning of CROA means that there is a quid pro quo. Why are you not focusing on the language of the statute amounts paid by the person? Doesn't by the person have some significance here? And the reason why I'm asking is, the arbitrator could well find that these were CROAs, credit repair organizations, based on the fair share payments. But the statute doesn't talk about payments by anybody. It talks about payments by the person. And speak to that distinction if you would. Does that help you or does that hurt you? I think that helps us, Your Honor, in the sense that that language, payment by a person, meaning the consumer, basically is another prong about why my clients were not a CROA to begin with. Because the payments by a person. Now, I'm talking about in terms of justifying the arbitrator's refusal to award damages. Well, that is that. Does the phrase by the person hurt or help you? I think that helps us because the amount paid in the damages section has to be an amount paid by the person, the consumer. And if the consumer made a voluntary contribution, as opposed to- Well, but they paid it, whether they did it voluntarily or not, they paid it. Well, if they didn't pay it, if the amount paid, if the definition of amount paid means quid pro quo, as the arbitrator found, means provided money in exchange for something. And the evidence was substantial that that's not what happened and that's what the arbitrator- Doesn't this case really come down to the point that did the arbitrator manifestly disregard the law? Right. By relying on the definition of credit repair organization and it's in return for services language to then conclude that there was a requirement that the payments not be voluntary in interpreting the actual damages. Isn't that the issue here? Does this misinterpretation by the arbitrator constitute manifest disregard of the law or merely calling it a different way that we might not agree with? I mean, or am I missing the point? I think it's more than that, Your Honor. I think it's looking at the damages provision. If you look at the damages provision, what hits one in the face is the term amounts paid. And that raises the question of what does that mean? If it means voluntary contributions, then the arbitrator was wrong. I don't think that would constitute manifest disregard. Of course, that's his interpretation and he had a basis for it. If it means that voluntary contributions are not embraced within the term amounts paid, then he was right. And there's simply no issue about manifest disregard. Well, that's tails are winning, heads you lose. You just said, you basically just wrote out manifest disregard. You said because it wasn't required, then I win. If it was required, I win. It has to be at some point that it's so obvious that it's indisputable and tells us what the law requires. You can't just say I'm gonna bring in something quid pro quo and all these things, black's dictionary. And I suppose you can always find some, you know how lawyers, we always can. You can always find some justification for anything. But the question is, is it so far afield to what the statute says clearly, unambiguously, that it's a disregard unless you allow people to bring in all these other things, quid pro. It says amount paid. That's like your tithes at church. You didn't pay up because church didn't give you anything. It is, you paid your tithe. You paid a pledge to a university, your alma mater. You say, well, it's not paid because of, no, it's paid. It's the amount paid. I mean, and so, if you're gonna allow, and you always start off by saying you disagree with this circuit, but this panel can't change the circuit's precedent. And we say that it is manifest disregard. That's the question, but you just said it. I win either way, no matter what. Your Honor, at the time, I'd like to respond, if I may. Your Honor, I suggest to you that what you just said is not the definition of manifest disregard. What you just said, basically, is that the arbitrator made, at least assume the arbitrator made a serious error. And as I understand what you just said, even if he made, or if he made a serious error, that's manifest disregard. And we, the court, should overturn it. And my response to that is that that's not the definition of manifest disregard. In fact, this circuit has specifically held that error, even serious error, and that's what the Supreme Court says too, is not manifest disregard of the law. The arbitrator did not disregard the law. He interpreted the law. And if he interpreted it miserably, it still is not manifest disregard and should be upheld. That's my response. Thank you very much. All right, Mr. Capel, your reply. Thank you, Your Honor. I think that Judge Keenan was absolutely right. The question is, was it manifest disregard for the law? And I'm gonna take a little bit of my time to read from Patton's decision of this court not that long ago. The arbitrator's act in a manifest disregard of the law if he disregards or modifies unambiguous contract provisions. Now, we're talking about a statute, which there's a stronger issue there, but I'll get to that in a minute. Moreover, an award fails to draw its essence from the agreement of an arbitrator who has based his award on his own personal notions of right and wrong. Such circumstance, the federal court has no choice but to refuse enforcement of the award. In this case, as explained below, the arbitrator disregarded the plain and unambiguous language of the governing arbitration agreement when he concluded that it included an implied one-year limitations period. In so doing, the arbitrator acted in manifest disregard of the law, failed to draw his award from the essence of the agreement. Put succinctly, the arbitrator appears to have revised the governing arbitration agreement on the basis of his own personal notions of right and wrong and imposed a limitations period on the parties that they had specifically rejected. When the arbitrator ignores the unambiguous language chosen by the parties, the arbitrator simply fails to do his job. Now, it says here the arbitrator in this instance simply amended the agreement and thus acted without authority. Now, in that case, the arbitrator implied a statute of limitations. One could say he was just implying, he was just, it's an interpretation of the contract in that case, it wasn't a statute, was that the statute of limitations that was in a prior version of the contract was really intended by the parties. Now, that's not such a crazy idea, but the court said he can't do that. Even though he said he was interpreting the contract, here we have a statute. Look not only at CompuCredit, look at Gilmer, look at Mitsubishi. The Supreme Court has made it clear. Look at your own decision in Markovia. With respect to a statute, the standard is strict. The court has to insert itself if the statute is violated. This is a statute that says any payments, any payments include voluntary payments plus any payments also include required payments under the service agreement and the fair share payments. Now, one of the arguments that Mr. Greenwald made was, well, the arbitrator could have decided required payments for the purposes of the definition of the Crow, that's 1679A3. He could have done it on the basis of fair share, but he didn't do it on the basis of fair share. He said later in his opinion, he could also do it with respect to fair share, but he specifically was talking, and you look at his decision, he was specifically talking about the payments made by consumers. Now, the any person question Judge Keenan referred to was a good question. And it could have been, the arbitrator could have decided, could have decided that this was not a payment from the individual consumer because it went through the CCA to the respondents, but he didn't decide that. He said the privity defense, he rejected it, and they didn't appeal that. So I think you, even if you ultimately said, well, it may be that this is not a payment from the person because it came through the CCAs and didn't come directly to the respondents, that argument was rejected by the arbitrator and not appealed. We don't think it's a good argument. We think the arbitrator was right, but that's the person argument. I don't think that the person argument really can be made at this point. And in fact, also in reality, these came from the persons. And Judge Gregory, you're entirely right. They got a statement every month, and the arbitrator, by the way, it's in the arbitration award. Every month they got a statement. It said, your, I believe it said, your donation will include a voluntary contribution of $3 per credit. Now, is that not a payment? Even though it may be voluntary, even though perhaps it could be waived, you know, you may get a fine and a traffic ticket and they may waive it. Does that mean that it was not a fine? And if you, the payment of those fines were not payments? Clearly, these were payments. And clearly as payments, they have to be viewed as being refundable. You know, there can be no, it seems to me no legitimate dispute. And under the definition of manifest disregard, you have to find that the lack of a compensatory award requires revision of the arbitrator's decision. The fact of the matter is, Mr. Greenwald said that the arbitrator did his job. He did not do his job. His job was to properly apply the federal statute. The CompuCredit case tells us, the Supreme Court tells us, that it is the function of the court to make sure that the statute is properly applied. And that was not done here by the district court. And in order to do that, your honors with respect have to reject what the arbitrator did here in rewriting the agreement and applying his own notions of what ought to be right or wrong, avoiding what he said would be a harsh result by a tortured reading of a clear provision. It's a clear provision. And the fact of the matter is, the arbitrator did not make any compensation, any payments. These were payments made on a monthly basis. The fact that some of them weren't made, those don't need to be refunded, that's true. Only the ones that need to be refunded are the ones that were paid. And here in this case, hundreds of millions of dollars were paid. The arbitrator ruled Crowe was violated. That was not appealed. That determination wasn't appealed. He even awarded punitive damages. And the fact of the matter is, those hundreds of millions of dollars should be ordered to be repaid. And unfortunately, the consequence of that may be to put them out of business. That's what happened in Cambridge. That's what Congress mandated. We can't make that judgment. In fact, even the arbitrator, initially when he talked about Crowe, he said that himself. You're out of time. Thank you very much. I appreciate your argument. Thank you. All right, I'll ask the clerk to adjourn court and then we'll come down and greet counsel. This item of business is adjourned until this afternoon. That's adjourned, guys. The United States Ensemble Court.
judges: William B. Traxler, Jr., Roger L. Gregory, Barbara Milano Keenan